UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★   MAR 2 9 2010

P.M. _____
TIME A.M. _____

-----------------------------------------------------------------X

ANTHONY JEROME McKNIGHT,

                              Plaintiff,

        — against —

DAWN MARIE MIDDLETON, *et al.*,

                              Defendants.

-----------------------------------------------------------------X

**MEMORANDUM and ORDER**

08-CV-3896 (SLT)(LB)

**TOWNES, United States District Judge:**

On September 23, 2008, Anthony Jerome McKnight ("Plaintiff"), proceeding *pro se*, commenced this action against sixteen defendants involved in a protracted child custody dispute over Plaintiff's ten-year-old daughter, Elena. For sake of ease, the Court has grouped Defendants into six categories. First, the lead defendant, Dawn Marie Middleton, is the mother and current custodian of Elena. Second, the "Mayerson Defendants" are defendants Harold A. Mayerson, Sophie Jacobi and Mayerson, Stutman, Abramowitz, Royer L.L.P., who represented Dawn Middleton in the child custody dispute. Third, the "State Defendants" include defendants State of New York; County of Kings Family Court; the Honorable Paula J. Hepner, Family Court Judge; Robert Ratanski, Clerk of the Family Court; and other unknown employees of the Family Court. Fourth, the "CLC Defendants" constitute defendants Children's Law Center, Carol Sherman, and Martha Schneiderman, who served as Elena's court-appointed law guardians. Fifth, "Lauro and Montrose" consists of defendants Louis Lauro, Ph.D, and Eileen Montrose, L.C.S.W., who were a court-appointed evaluator and social worker, respectively. Sixth, "Middleton Relatives" encompass Ilona T. Middleton, Carl J. Middleton, and Kirsten L. Middleton, relatives of Dawn Middleton.

1

Plaintiff's First Amended Complaint, a model of prolixity at 130 pages, asserts seventy-two causes of action, including claims under 42 U.S.C. §§ 1981, 1982, 1983, 1985(3), 1986, and 1988, alleging violations of the First, Fourth, Fifth, Eighth, Ninth, Thirteenth and Fourteenth Amendments; the Americans with Disabilities Act of 1990 ("ADA"); and claims under state statutory and common law. Dawn Middleton, the Mayerson Defendants, the State Defendants, the CLC Defendants, and Lauro and Montrose moved to dismiss the Amended Complaint pursuant to Federal Rules of Civil Procedure Rule 12(b)(6).

For the following reasons, the Court dismisses the Amended Complaint in its entirety against all Defendants.

## BACKGROUND

This suit arises out of a County of Kings Family Court ("Family Court") custody dispute between *pro se* Plaintiff and Dawn Middleton, regarding their daughter, Elena. This matter was transferred from the Commonwealth of Pennsylvania, where Plaintiff resides, to the Family Court where Dawn Middleton and Elena reside. During the pendency of this federal court litigation, the custody dispute remains ongoing in Family Court.

On September 23, 2008, Plaintiff filed his Complaint raising numerous claims against Defendants for violations of his constitutional and federal statutory rights as well as rights under state law in connection with the child custody proceedings. Plaintiff also sought injunctive relief holding various sections of the N.Y. Domestic Relations law unconstitutional. Plaintiff's complaint also named as plaintiffs "a Class of Pro Se Litigants Similarly Situated in the County of Kings Family Court," "a Class of African-American Fathers Similarly Situated in the County of Kings Family Court," and a class of Plaintiff's "African-American Relatives Similarly Situated" (collectively, the "Class Plaintiffs"). On November 12, 2008, the Court directed

2

Plaintiff to either retain counsel for the Class Plaintiffs or show cause why the Class Plaintiffs should not be dismissed from the action.

On January 8, 2009, Plaintiff filed an Amended Complaint. There, Plaintiff added two defendants to the State Defendants and raised several additional claims. Nevertheless, like the original complaint, Plaintiff's amended pleading purported to be brought on behalf of the Class Plaintiffs. Plaintiff failed to retain counsel for Class Plaintiffs or to show cause why the Class Plaintiffs should not be dismissed from the action. On February 11, 2009, the Court dismissed the Class Plaintiffs from the action and directed the Clerk to strike Class Plaintiffs from the caption. The Amended Complaint's sixty-ninth cause of action for class certification was consequently dismissed as well.

In March 2009, the Court granted Dawn Middleton, the Mayerson Defendants, State Defendants, the CLC Defendants, and Lauro and Montrose leave to move to dismiss the Amended Complaint pursuant to Rule 12(b)(6). The Court now considers those motions.

## DISCUSSION

### I.      Rule 12(b)(6) Standard of Review

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for dismissal of a complaint that fails to state a claim upon which relief can be granted. "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007). To withstand a motion to dismiss, a complaint's "factual allegations must be enough to raise a right to relief above the speculative

level." *Id.* at 555. It must plead facts sufficient "to state a claim for relief that is plausible on its face." *Id.* at 570.

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (reversing the Second Circuit's decision in *Iqbal v. Hasty,* 490 F.3d 143 (2d Cir. 2007)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Thus, "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (internal quotation marks omitted). Examining whether a complaint states a plausible claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," a complaint fails to state a claim. *Id.* In short, the plaintiff's factual allegations, must show that the plaintiff's claim is "plausible," not merely "conceivable." *Id.* at 1951.

In applying the plausibility standard set forth in *Twombly* and *Iqbal*, a court "assume[s] the veracity" only of "well-pleaded factual allegations," and draws all reasonable inferences from such allegations in the plaintiff's favor. *Argeropoulos v. Exide Technologies*, No. 08-CV-3760, 2009 WL 2132443, at *3 (E.D.N.Y. July 8, 2009) (citing *Iqbal*, 129 S. Ct. at 1950). Pleadings that are no more than "legal conclusions," or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are not entitled to the assumption of truth. *Iqbal*, 129 S.Ct. at 1949.

## II.   *Rooker-Feldman* Doctrine

Several Defendants argue that Plaintiff's action must be dismissed based on the *Rooker-Feldman* doctrine. Indeed, "[w]here a federal suit follows a state suit, the former may be prohibited by the so-called *Rooker-Feldman* doctrine in certain circumstances." *Hoblock v. Albany County Bd. of Elections*, 422 F.3d 77, 83 (2d Cir. 2005) (citing 18B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure: Jurisdiction 2d § 4469.1 (2002)). "Underlying the *Rooker-Feldman* doctrine is the principle, expressed by Congress in 28 U.S.C. § 1257, that within the federal judicial system, only the Supreme Court may review state-court decisions." *Id.* at 85. The Supreme Court has recently reined in the use of the doctrine, cautioning that it was meant to occupy a "narrow ground." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). The Court held that *Rooker-Feldman* "is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Id.*

In the wake of *Exxon Mobil*, the Second Circuit revisited its prior precedents and limited the application of *Rooker-Feldman* to cases satisfying four "requirements":

> First, the federal-court plaintiff must have lost in state court. Second, the plaintiff must "complain[] of injuries caused by [a] state-court judgment[.]" Third, the plaintiff must "invite district court review and rejection of [that] judgment[]." Fourth, the state-court judgment must have been "rendered before the district court proceedings commenced"-- i.e., *Rooker-Feldman* has no application to federal-court suits proceeding in parallel with ongoing state-court litigation.

*Hoblock*, 422 F.3d at 85 (alterations in original) (quoting *Exxon Mobil*, 544 U.S. at 284). The first and fourth requirements are procedural, while the second and third are substantive. *Id.*

Here, the *Rooker-Feldman* doctrine does not bar Plaintiff's claims because Plaintiff does not "invite district court review and rejection" of a state court judgment. *Id.* The doctrine only applies when "the requested federal court remedy of an alleged injury caused by a state court

judgment would require overturning or modifying that state court judgment." *McNamara v. Kaye*, No. 08-4561-cv, 2009 WL 3377914, at *1 (2d Cir. Oct. 20, 2009) (citing *Hoblock*, 422 F.3d at 85). In the child custody context, in order to satisfy this substantive requirement, a plaintiff must be "plainly" seeking to "repair[] to federal court to undo the [Family Court] judgment." *Green v. Mattingly*, 585 F.3d 97, 102 (2d Cir. 2009) (quoting *Exxon Mobil*, 544 U.S. at 293). In *Green*, the Second Circuit held that *Rooker-Feldman* did not apply to a plaintiff's challenge of a temporary custody award that was later reversed by the Family Court itself. *Id.* The Second Circuit reasoned that, since the child had already been returned to the plaintiff by the Family Court, no state-court "judgment" remained to be undone by federal courts. *Id.* In *McNamara*, the Second Circuit further added, in *dicta,* that a plaintiff's claims, insomuch as they challenge only "the procedures applied in all attorney disciplinary proceedings and seek damages and prospective relief rather than a modification of [the plaintiff's] suspension or reinstatement orders," would not be barred by *Rooker-Feldman*. 2009 WL 3377914, at *1. Thus, the Court reads *McNamara* and *Green* to suggest that a plaintiff's claims seeking only monetary damages or prospective-only relief against court procedures rather than modification of a family court's temporary custody or other orders would not run afoul of the *Rooker-Feldman* doctrine.

Plaintiff's claims do not seek to undo any Family Court decisions. At the heart of Plaintiff's case is a January 23, 2008, Family Court order placing Elena in Dawn Middleton's temporary custody, Am. Compl. ¶ 77; *see* Sanders Aff., Ex. G, "Temporary Order of Custody" (hereinafter, "Temp. Cust. Order"), and other Family Court orders and procedures. Plaintiff alleges that these decisions denied him "his constitutionally guaranteed rights of due process and equal protection." *See, e.g.,* Am. Compl. ¶ 81. Yet, Plaintiff has carefully not requested that this Court disturb any of these Family Court rulings. He has not applied for a vacatur of the

temporary custody order or the placement of the child in his temporary custody. Instead,

Plaintiff only seeks specified monetary damages, *see id.* ¶¶ 739-42, and injunctive relief holding

that various sections and procedures of the N.Y. Dom. Rel. Law unconstitutional prospectively,

*see id.* ¶¶ 451-464, 728-29. Consequently, the Court follows the Second Circuit's reasoning in

*McNamara* and *Green* and finds that *Rooker-Feldman* does not apply to Plaintiff's claims that

only seek monetary damages or prospective injunctive relief and do not seek to overturn a child

custody award. *See also Pittman v. Cuyahoga County Dep't of Children and Family Servs.*, No.

06-3312, 2007 WL 2050840, at *3 (6th Cir. July 16, 2007) (holding that *Rooker-Feldman* does

not bar plaintiff claims that do not focus on the outcome of state court custody proceedings or

otherwise request reversal of a juvenile court decision).[1]

---

[1] Two of Plaintiff's claims require closer analysis. Plaintiff's sixty-eighth cause of action requests this Court to "enjoin the unlawful search and seizure of McKnight's oral, wire and electronic communications." The Court believes that the origin of this cause of action is a series of Family Court orders directing that court-ordered communications between Plaintiff and Elena be recorded. For example, a May 6, 2008 Family Court order mandates that the "telephone calls [between Plaintiff and Elena] shall be recorded to assure that the content of the conversations are appropriate and may be discontinued if the content is not." *See* Sanders Aff., Ex. J "May 6, 2008 Order." A similar order dated September 23, 2008, appears in record, directing that "telephone calls shall continue to be recorded." Plaintiff further alleges that "[o]n July 3, 2008, over McKnight's objections, the Brooklyn Family Court Ordered Defendant Middleton, a non-party to the telephone conversation between Elena and McKnight to unlawfully intercept and record those oral, wire and electronic communications." Am. Compl. ¶ 203. Thus, as relief, Plaintiff states that he "is entitled to have Defendants enjoined from unlawfully intercepting, recording and disclosing his oral, wire and electronic communications." *Id.* ¶ 725.

At first blush, this claim for relief may run afoul of *Rooker-Feldman* since it seems to directly contradict a Family Court order. Nevertheless, *Rooker-Feldman* only applies to state-court judgment "rendered before the district court proceedings commenced." *Hoblock*, 422 F.3d at 85. Here, if the Court were to grant Plaintiff's request and enjoin the future recordings of conversations between Plaintiff and Elena, it would not disturb any Family Court judgment rendered before the commencement of this federal action. For example, the May 6, 2008 order only pertains to communications from May 15, 2008 to May 28, 2008. *See* Ex. J "May 6, 2008 Order." Thus, enjoining *future* recordings of Plaintiff's conversations with Elena would not entail modifying an order issued before September 23, 2008, the date this action was initiated.

Plaintiff's seventy-second cause of action requests that defendant Dawn Middleton be permanently enjoined from removing Elena from New York and the United States. *See* Am. Compl. ¶¶ 730-34. The Court is not aware of any Family Court order permitting Dawn

### III.    Domestic Relations Exception

Several Defendants also assert that this Court's jurisdiction is barred by the domestic

relations exception, which "divests the federal courts of power to issue divorce, alimony, and

child custody decrees." *Ankenbrandt v. Richards*, 504 U.S. 689, 703 (1992). At the heart of the

domestic relations exception lies federal-court recognition that "the whole subject of the

domestic relations of husband and wife, parent and child, belongs to the laws of the States and

not to the laws of the United States." *Puletti v. Patel*, No. 05-cv-2293, 2006 WL 2010809, at *4

(E.D.N.Y. July 14, 2006) (quoting *In re Burrus*, 136 U.S. 586, 593-94 (1890)). Indeed, it is well

settled that federal courts generally do not have jurisdiction over such matters based upon a

"policy consideration that the states have traditionally adjudicated marital and child custody

disputes and therefore have developed competence and expertise in adjudicating such matters,

which federal courts lack." *Thomas v. New York City*, 814 F.Supp. 1139, 1146 (E.D.N.Y. 1993).

Under the domestic relations exception, "[f]ederal courts have discretion to abstain from

exercising jurisdiction over issues on the verge of being matrimonial in nature as long as full and

fair adjudication is available in state courts." *Fischer v. Clark*, No. 08-CV-3807, 2009 WL

3063313, at *2 (E.D.N.Y. Sept. 24, 2009) (internal quotation marks omitted). While the

exception finds its origin in an interpretation of the federal courts' diversity jurisdiction, it also

has been applied to federal question jurisdiction, "includ[ing] civil rights actions directed at

challenging the results of domestic relations proceedings." *Fischer,* 2009 WL 3063313, at *2

(quoting *Mitchell-Angel v. Cronin*, No. 95-CV-7937, 1996 WL 107300 LEXIS 4416, at *5 (2d

Cir. Mar. 8, 1996)).

---

Middleton to remove Elena from New York or the United States rendered before September 23,
2008. Thus, if the Court were to grant this request for relief, it would not entail undoing any
state-court decision.

The exception, however, is still "very narrow." *Williams v. Lambert*, 46 F.3d 1275, 1283 (2d Cir. 1995). "[It does not] strip the federal courts of authority to hear cases arising from the domestic relations of persons unless they seek the granting or modification of a divorce or alimony decree . . . or a child custody decree." *Id.* (quoting *Ankenbrandt*, 504 U.S. at 701-02). In *Ankenbrandt*, the Court held the exception inapplicable to a plaintiff's state-law tort claims against her ex-husband who had allegedly committed child abuse after the two were granted a divorce because the suit only sought monetary damages. 504 U.S. at 704. Accordingly, claims solely seeking monetary relief will rarely invoke the domestic relations exception. *See King v. Comm'r*, No. 00-9234, 2003 WL 1343011, at *2 (2d Cir. Mar. 19, 2003) (holding that the domestic relations exception is irrelevant where the plaintiff seeks monetary damages and does not seek a domestic relations award or reinstatement of his parental rights); *Ellis v. Little Flower Children's Servs.*, No. CV 99-0503, 2000 WL 516887, at *4 (E.D.N.Y. Mar. 1, 2000) ("If what a plaintiff seeks is an award of damages for the unconstitutional enforcement of a custody order, a federal court may entertain the claim.") (citing *Hurlman v. Rice*, 927 F.2d 74, 79 (2d Cir. 1991)).

Nevertheless, the Second Circuit has recently departed from this general rule where the claims "begin and end in a domestic dispute." *Schottel v. Kutyba*, No. 06-1577-cv, 2009 WL 230106, at *1 (2d Cir. Feb. 2, 2009). In *Schottel*, the plaintiff alleged fraud and coercion in divorce proceedings that deprived her of custody and visitation rights and sought only monetary damages in a proposed amended complaint. *Id.* The Second Circuit construed the tort claims, even though only for monetary damages, as "at heart, a dispute surrounding the custody of [the plaintiff's] child." *Id.* Unlike the case in *Ankenbrandt*, where the tort claims arose after the status of familial relationship had previously been determined by state law and thus had no

bearing on the child abuse claims, the Second Circuit found *Schottel*'s tort claims "[in]distinct from the domestic relationship," involving the "dissolution of marriage—an area at the core of the domestic relations exception." *Id.* The court reasoned that "a plaintiff cannot obtain federal jurisdiction merely by rewriting a domestic dispute as a tort claim for monetary damages." *Id.* Thus, under Second Circuit recent precedent, this Court may be deprived of jurisdiction over claims that "begin and end in a domestic dispute," even if the plaintiff is seeking only monetary damages.[2]

Here, Plaintiff's complaint sets forth seventy-two causes of action against the various defendants. These numerous claims can be grouped into fourteen general categories of claims:

(i)    constitutional claims based on the Family Court proceedings and its award of temporary custody to Dawn Middleton, (first through ninth, forty-seventh claims);

(ii)   constitutional claims stemming from his federal court litigation, (tenth through fourteenth claims);

(iii)  constitutional and state law claims regarding court-ordered limitations on his communications with Elena, (fifteenth and sixteenth claims);

(iv)   constitutional and state law claims regarding the recording of his communications with Elena, (eighteenth, nineteenth, sixty-first, sixty-second, sixty-eighth claims);

(v)    common law and state law claims regarding the custody agreement, (twentieth through twenty-eighth claims);

(vi)   defamation claims against several defendants, (twenty-ninth through thirty-fourth claims);

(vii)  tort and common law claims regarding the custody of Elena, (thirty-fifth through forty-sixth claims);

(viii) violations of various state wiretap laws, (forty-ninth through sixtieth claims);

(ix)   constitutional claims for failure to supervise, (sixty-third through sixty-sixth claims);

(x)    constitutional and federal statutory claims for enjoining the operation of N.Y. Dom. Rel. Law, (seventieth and seventy-first claims);

(xi)   a claim under the Americans with Disabilities Act ("ADA"), (seventeenth claim);

(xii)  a claim for invasion of privacy against defendant Lauro, (forty-eighth claim);

---

[2] While *Schottel* involved a diversity case, the Court sees no reason why its rationale should not apply to federal question cases as found in *Fischer,* 2009 WL 3063313, and *Mitchell-Angel,* 1996 WL 107300 LEXIS 4416. In any event, the bulk of claims to which the domestic relations exception applies are pendent tort or other state law claims.

(xiii) a claim for intentional infliction of emotional distress, (sixty-seventh claim); and

(xiv) a claim for enjoining Dawn Middleton from removing Elena from New York and the United States, (seventy-second claim).

### a. Claims Subject to Federal Court Jurisdiction

This Court may assert jurisdiction over the (i) and (x) categories of claims dealing with the constitutionality of the Family Court's custody order, Family Court proceedings, and the N.Y. Dom. Rel. Law. To the extent Plaintiff is challenging the constitutionality of state custody laws or proceedings, this Court may review those claims and order appropriate relief. *See Stanley v. Illinois*, 405 U.S. 645, 651 (1972) ("The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment . . . the Equal Protection Clause of the Fourteenth Amendment . . . and the Ninth Amendment[.]") (internal citations omitted); *Wilkinson ex rel. Wilkinson v. Russell*, 182 F.3d 89, 103-04 (2d Cir. 1999) (recognizing that a parent's liberty interest in the custody of a child is subject to due process protection); *Thomas v. New York City*, 814 F.Supp. 1139, 1146-47 (E.D.N.Y. 1993).

In *Thomas*, the court confronted plaintiffs alleging, *inter alia*, § 1983 claims of unconstitutional interference with familial relations and state and federal claims of disruption of the family. 814 F.Supp. at 1146-47. In that case, as here, the plaintiff did not request that the court issue a decree ordering the state to return her children to her custody or to restore her parental rights. *Id.* at 1147. The court declined to apply the domestic relations exception, holding that,

> [T]he adjudication of whether the state's procedure used to separate a parent from a child complies with the constitutional due process requirement is squarely within this Court's federal question jurisdiction and does not entail any investigation by the federal court into the fitness of the parent to care for the child or the issuance of any decree that the parent must necessarily be reunited with the child; such an adjudication will entail at most a description of what process a state

must follow in making determinations to deprive a parent of parental rights and custody of his or her child. . . .

*Id.*

As stated above, Plaintiff only seeks monetary damages and prospective injunctive relief striking provisions of N.Y. Dom. Rel. Law. He does not seek the issuance or modification of the child custody decrees and, therefore, the domestic relations exception has no bearing on these claims. *See also Smith v. Oakland County Circuit Court*, 344 F. Supp. 2d 1030, 1065 (E.D. Mich. 2004) (permitting facial challenge to state statute and due process challenge to state proceedings); *Catz v. Chalker*, 142 F.3d 279, 291-92 (6th Cir. 1998) (overruling dismissal of due process claims because it did not implicate merits of divorce decree and only required a judicial determination whether certain judicial proceedings, involving a divorce, comported with the federal constitutional guarantee of due process ).

The claims grouped in the (ii), (iv), (vi), (xiii), (ix), (xi), (xii), and (xiii) categories do not involve domestic relations issues or focus on Defendants' actions independent and separate from the custody orders and hence do not implicate the domestic relations exceptions. While they all originate from the disputed custody proceedings, they are "distinct from the domestic relationship," *Schottel*, 2009 WL 230106, at *1, and thus *Ankenbrandt's* limitation to the exception applies to these claims.

Accordingly, the domestic relations exception does not preclude this Court's jurisdiction over the first through fourteenth, seventeenth through nineteenth, twenty-ninth through thirty-fourth, and forty-seventh through seventy-first claims.

### b. Claims Divested of Federal Court Jurisdiction

The claims in the (iii), (v), (vii), and (xiv) categories are a different matter. It is difficult to see how they are distinct injuries from the Family Court's custody orders in this ongoing

custody dispute. In the (iii) category, Plaintiff claims injuries from the Family Court's orders regulating his communications with Elena. To entertain jurisdiction over these claims would invite the Court to meddle in scheduling the appropriate time, place and manner of parental communications – an issue properly in the province of the state courts. In the (v) category of claims, Plaintiff alleges a breach of custody agreement between him and Dawn Middleton and interference with that custody agreement by various defendants. Again, while Plaintiff styles these claims as contract or tort claims, they are nothing more than challenges to Elena's custody arrangements. Likewise, the (vii) category involves tort claims from Elena's placement with Middleton and the Middleton Relatives, which directly challenges Elena's custody award. Finally, under the (xiv) category, whether Dawn Middleton may travel outside of New York or the United States with Elena is a question best left for the family court to resolve.

No matter how artfully Plaintiff has pleaded these claims, they all "begin and end in a domestic dispute." *Schottel*, 2009 WL 230106, at *1. At heart, he is complaining of the state court custody proceedings and thus his claims are indistinct from the domestic dispute. Plaintiff may not "rewrit[e his] domestic dispute as a tort claim," *id.*, or a civil rights claim by simply requesting only monetary damages. As the Supreme Court stated long ago, "As to the right to the control and possession of this child, as it is contested by its father and its grandfather, it is one in regard to which neither the Congress of the United States nor any authority of the United States has any special jurisdiction." *In re Burrus*, 136 U.S. at 594. This Court does not have superior competence to adjudicate these claims and, therefore, leaves them for the state courts to decide.

13

Accordingly, the Court is divested of jurisdiction over the following claims and they are hereby dismissed: fifteenth, sixteenth, twentieth through twenty-eighth, thirty-fifth through forty-sixth, and seventy-second.

## IV. *Younger* Abstention

Next, State Defendants argue that this Court should abstain from taking jurisdiction over this action pursuant to the abstention doctrine set forth in *Younger v. Harris*, 401 U.S. 37 (1971), and its progeny. Under the doctrine, federal courts are forbidden from enjoining ongoing state proceedings. *Hartford Courant Co. v. Pelligrino*, 380 F.3d 83, 100 (2d Cir. 2004). *Younger* abstention is mandatory when three conditions are met: "(1) there is an ongoing state proceeding; (2) an important state interest is implicated in that proceeding; and (3) the state proceeding affords the federal plaintiff an adequate opportunity for judicial review of the federal constitutional claims." *Diamond "D" Constr. Corp. v. McGowan*, 282 F.3d 191, 198 (2d Cir. 2002).

The Second Circuit has held that "application of the *Younger* doctrine is inappropriate where the litigant seeks money damages for an alleged violation of § 1983[.]" *Morpurgo v. Inc. Vill. of Sag Harbor*, No. 07-5392-pr, 2009 WL 1361346, at *1 (2d Cir. May 15, 2009) (quoting *Rivers v. McLeod*, 252 F.3d 99, 101-02 (2d Cir. 2001)). Thus, the *Younger* abstention doctrine only applies to Plaintiff's claims for injunctive relief. *See id.*; *see also MacPherson v. Town of Southampton*, No. 07-CV-3497, 2009 WL 3246634, at *8 (E.D.N.Y. Sept. 30, 2009). Consequently, the Court must consider whether *Younger* may bar Plaintiff's requests to enjoin the search and seizure of his communications with Elena (sixty-eighth claim), to enjoin the operation of the N.Y. Dom. Rel. Law as unconstitutional (seventieth claim), to enjoin the operation of the New York Domestic Relations Law as preempted (seventy-first claim), and to

14

enjoin Dawn Middleton from removing Elena from New York and the United States (seventy-second claim).[3]

The Court holds that the *Younger* abstention conditions are met for Plaintiff's claims seeking injunctive relief. First, state court proceedings are still ongoing. The trial for Plaintiff's petition for custody and visitation has begun and is scheduled to continue over the next few months. *See* Docket entry # 133. Second, as stated above, the heart of this case is a child custody dispute, a matter rightfully reserved for state courts. *See, e.g., Puletti,* 2006 WL 2010809, at *4 ("the whole subject of the domestic relations of . . . parent and child[] belongs to the laws of the States and not to the laws of the United States."). Thus, it is without question that this matter involves an "important state interest." *McGowan,* 282 F.3d at 198. Finally, Plaintiff would have "an adequate opportunity for judicial review of the federal constitutional claims" in state court. *Id.* While Plaintiff correctly notes that the Family Court orders in question in this litigation are not appealable as of right in state court because they are not "order[s] of disposition," *see* N.Y. FAM. CT. ACT § 1112(a); *see also Bridges v. Hertica,* 651 N.Y.S.2d 257, 258 (N.Y. App. Div. 1996) ("The temporary order containing various custodial provisions pending a final disposition was not a final order and is not appealable as of right[.]"), nothing precludes Plaintiff from raising these claims in a state appellate court at the conclusion of the Family Court proceedings. For example, after the Family Court makes its final disposition on custody and visitation, Plaintiff may appeal that decision to the Appellate Division and raise the unconstitutionality of the N.Y. Dom. Rel. Law and the orders of the Family Court to record his communications with Elena in that court.

---

[3] The Court has already ruled that the domestic relations exceptions precludes our jurisdiction over Plaintiff's seventy-second claim for relief – whether Dawn Middleton may be enjoined from removing Elena from New York and the United States. Nevertheless, the Court reviews this claim under *Younger* as an alternate basis for dismissal.

Accordingly, the Court abstains from considering the following claims: sixty-eighth, seventieth, seventy-first, and seventy-second and they are hereby dismissed.

## V.    State Defendants

State Defendants also argue that they are immune from Plaintiff's suit under sovereign immunity and absolute judicial immunity.

### a.  State of New York and County of Kings Family Court

It is clear that the State of New York and the County of Kings Family Court must be dismissed from this action based on Eleventh Amendment sovereign immunity. The Eleventh Amendment states: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "Although the Amendment, by its terms, bars only federal suits against state governments by citizens of another state or foreign country, it has been interpreted also to bar federal suits against state governments by a state's own citizens . . . as well as state court actions against state governments. . . ." *Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 236 (2d Cir. 2006) (internal citations omitted). Simply put, "as a general rule, state governments may not be sued in federal court unless they have waived their Eleventh Amendment immunity," or unless Congress has "abrogate[d] the states' Eleventh Amendment immunity when acting pursuant to its authority under Section 5 of the Fourteenth Amendment." *Id.* This Eleventh Amendment immunity extends to state officials acting in their official capacities, *see, e.g., Bail v. Ramirez*, No. 04 Civ. 5084, 2007 WL 959045, at *4 (S.D.N.Y. Mar. 29, 2007), and state entities, *see, e.g., Garcia v. S.U.N.Y. Health Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001).

In this case, Plaintiff is a citizen of another state and there is no suggestion of state acquiescence to this suit. Accordingly, he is explicitly barred by the Eleventh Amendment from bringing suit in this Court against the State of New York and state officials acting in their official capacities. Furthermore, the New York State Unified Court System is entitled to sovereign immunity as an "arm of the State." *See Gollomp v. Spitzer*, 568 F.3d 355, 368 (2d Cir. 2009) (quoting *Woods*, 466 F.3d at 236). The County of Kings Family Court is a part of the New York State Unified Court system and is, therefore, also protected by the State's sovereign immunity from suit in federal court.

Plaintiff attempts to escape this bar by citing the ADA's abrogation of state immunity. *See* 42 U.S.C. § 12202. Plaintiff's ADA claim against State Defendants must fall under Title II of the ADA, which forbids discrimination against persons with disabilities in public services, programs, and activities. *See Tennessee v. Lane*, 541 U.S. 509, 516-17 (2004). The Supreme Court has held that Title II pierces a state's sovereign immunity as applied to cases implicating a plaintiff's fundamental right of access to the courts. *Id.* at 533-34. In *Lane*, a group of paraplegics sued Tennessee, alleging that state had denied them physical access to its courts. *Id.* at 529-31. The Court held that Congress properly abrogated the state's sovereign immunity because access to courts represented a fundamental right with a documented history of unconstitutional discrimination. *Id.*

Since *Lane*, courts have disagreed on the conditions required to abrogate sovereign immunity under Title II. *See Press v. S.U.N.Y. at Stony Brook*, 388 F. Supp. 2d 127, 133 (E.D.N.Y. 2005). Some courts will require a Title II claimant to establish the violation of a fundamental right. *See Johnson v. S. Conn. State Univ.*, No 02-Civ.2065, 2004 WL 2377225, at *4 (D.Conn. Sept. 30, 2004) ("[I]n the wake of *Lane*, it appears that a private suit for money

damages under Title II of the ADA may be maintained against a state only if the plaintiff can establish that the Title II violation involved a fundamental right."); *see also Roe v. Johnson*, 334 F. Supp. 2d 415, 421 n.9 (S.D.N.Y. 2004). Other courts maintain that the Title II violation must be "motivated by discriminatory animus or ill will based on the plaintiff's disability." *See, e.g., Sacca v. Buffalo State Coll., S.U.N.Y.*, No. 01 Civ. 881, 2004 WL 2095458, at *3 (W.D.N.Y. Sept. 20, 2004) (citing *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 111-12 (2d Cir. 2001)).

Plaintiff fails to establish abrogation under either test. Plaintiff appears to allege ADA violations based on mental disability or drug addiction. Nevertheless, Plaintiff does not allege that State Defendants violated his right of access to courts based on his alleged disability. Instead, Plaintiff only claims that a July 3, 2008 Family Court's order is "unconstitutional because it infringes upon McKnight's right to prompt medical treatment and recovery implied or guaranteed under . . . the ADA[.]" Am. Compl. ¶ 297. He further asseverates that the State Defendants violated his ADA rights by "claiming that [he] suffers from an undiagnosable mental illness, disease or defect." *Id.* ¶ 520. Plaintiff also avers that Judge Hepner ordered him to provide proof of his successful drug rehabilitation and "subscribe[d] to the Other Defendants labeling McKnight as 'crazy,' 'complexly mentally ill,' and 'bizarre.'" Pl. Br. Opp. State Def. 17. He claims that such descriptions "are coded words commonly used to wrongfully suggest continuing drug addiction, which violate the ADA." *Id.* While confusing and barely coherent, none of these allegations are sufficient to abrogate the State's sovereign immunity under Title II of the ADA. Plaintiff does not claim a deprivation of a fundamental right nor has Plaintiff alleged that State Defendants were motivated by discriminatory animus or ill will based on his alleged disability.

Finally, Plaintiff also argues that State Defendants' sovereign immunity may be abrogated by Title VI of the Civil Rights Acts of 1964. Title VI covers only those claims of discriminatory conduct where "federal funding is given to a non-federal entity which, in turn, provides financial assistance to the ultimate beneficiary." *Koumantaros v. City Univ. of New York*, No. 03 CIV 10170, 2007 WL 840115, at *7 n.8 (S.D.N.Y. Mar. 19, 2007) (quoting *Soberal-Perez v. Heckler*, 717 F.2d 36, 38 (2d Cir. 1983)). The State Defendants are not non-federal entities that provide financial assistance to beneficiaries and Plaintiff's claims do not arise out of any Federally-funded program. Consequently, this argument is without merit.

Accordingly, the State of New York, all state officials in their official capacities, and the County of Kings Family Court are hereby dismissed as parties to this action. Furthermore, Plaintiff's sixty-third and sixty-fourth claims against the County of Kings Family Court and the State of New York for failure to properly supervise are also dismissed.

### b. Judge Hepner's Absolute Immunity

Judge Hepner of the Family Court is likewise dismissed from this case in her individual capacity. It is well settled that judges generally have absolute immunity from suits for money damages for their judicial actions. *Bliven v. Hunt*, 579 F.3d 204, 209 (2d Cir. 2009). The purpose of absolute immunity is to protect "the independent and impartial exercise of judgment vital to the judiciary [which] might be impaired by exposure to potential damages liability." *Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 435 (1993) (denying court reporters absolute immunity based on their non-discretionary function to record proceedings verbatim). This species of immunity "is an immunity from suit, not just from ultimate assessment of damages." *Mireles v. Waco*, 502 U.S. 9, 11 (1991). Thus, it "operates to shield judges acting in their official capacity," *DiPasquale v. Milin*, 303 F. Supp. 2d 430, 431 (S.D.N.Y. 2004), and bars

19

"claims against [judicial] defendants in their individual capacities," *Abrahams v. Appellate Div. of the Supreme Court*, 473 F. Supp. 2d 550, 557 (S.D.N.Y. 2007). Absolute judicial immunity has two limitations. First, a judge is not immune from liability for "nonjudicial actions, i.e., actions not taken in the judge's judicial capacity." *Mireles*, 502 U.S. at 11. Second, a judge is not immune for actions, though judicial in nature, "taken in the complete absence of all jurisdiction." *Id.*

Plaintiff first contends that Judge Hepner acted in the complete absence of all jurisdiction by issuing "wiretap orders." Plaintiff contends that a "child custody case is not a criminal case and [Plaintiff] has not engaged in any of the enumerated criminal offenses for which wiretaps can be issued." Pl.'s State Def. Mem. Opp. 6.

A judge will be denied immunity for damages where she (i) acts in the clear absence of all jurisdiction and (ii) knew or must have known that she was acting in such a manner. *Tucker v. Outwater*, 118 F.3d 930, 936 (2d Cir. 1997). The first element of the test is an "objective" inquiry as to whether "jurisdiction is clearly absent, *i.e,* . . . no reasonable person would have thought jurisdiction proper." *Maestri v. Jutkofsky,* 860 F.2d 50, 53 (2d Cir. 1988). The second element of the test is a subjective inquiry as to whether "the judge whose actions are questioned actually knew or must have known" that she was acting in the clear absence of all jurisdiction. *Id.* The Supreme Court has mandated that "the scope of the judge's jurisdiction must be construed broadly when the issue is the immunity of the judge." *Stump v. Sparkman,* 435 U.S. 349, 356 (1978). "[A] judge will not be deprived of immunity because the action [s]he took was in error, was done maliciously, or was in excess of h[er] authority; rather, [s]he will be subject to liability only when [s]he has acted in the '*clear absence of all jurisdiction.*'" *Id.* at 356-57.

Thus, the Court distinguishes between judicial acts that are in "excess of . . . authority" and acts that are in "clear absence of all jurisdiction." *Id.*

> Where there is clearly no jurisdiction over the subject-matter any authority exercised is a usurped authority, and for the exercise of such authority, when the want of jurisdiction is known to the judge, no excuse is permissible. *But where jurisdiction over the subject-matter is invested by law in the judge, or in the court which [s]he holds, the manner and extent in which the jurisdiction shall be exercised are generally as much questions for h[er] determination as any other questions involved in the case,* although upon the correctness of h[er] determination in these particulars the validity of h[er] judgments may depend.

*Stump,* 435 U.S. at 356 n.6 (emphasis added). Here, Judge Hepner was clearly vested with subject matter jurisdiction over the Plaintiff's child custody case. *See* N.Y. Family Court Act § 115. Judge Hepner's rulings regarding the custody dispute, including her orders to record Plaintiff's conversations with Elena, were well within her jurisdiction, whether or not they were legally sound. The principle of judicial immunity recognizes that a judge may err. But, "it is better for a judge when exercising the discretion inherent in his judicial power 'to risk some error and possible injury from such error than not to decide or act at all.'" *Green v. Maraio,* 722 F.2d 1013, 1017 (2d Cir. 1983) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 242 (1974)). Accordingly, Judge Hepner's judicial immunity is not stripped based on the propriety of her particular rulings, where there is no question as to her subject matter jurisdiction over the case.

Second, Plaintiff contends that Judge Hepner's rulings are based upon racial and gender considerations and are in retaliation for Plaintiff's filing of lawsuit against the court and others. Nevertheless, "even allegations of bad faith or malice cannot overcome judicial immunity." *Bliven,* 579 F.3d at 209; *see also Outwater,* 118 F.3d at 932 ("The cloak of immunity is not pierced by allegations of bad faith or malice, even though unfairness and injustice to a litigant may result on occasion.") (internal quotation marks and citations omitted.). "Judges are absolutely immune from liability for judicial acts, however erroneous the act and however evil

21

the motive." *Bliven v. Hunt*, 418 F. Supp. 2d 135, 137 (E.D.N.Y. 2005). Thus, even though Plaintiff's allegations are accepted as true, they do not negate Judge Hepner's immunity from suit in this case. "Family court judges are entitled to the same protections from harassment and intimidation resulting from actions taken in their judicial capacity as those afforded to other state and federal judges. Given the inherently emotional nature of their work, family court judges may be particularly susceptible to harassment." *Lewittes v. Lobis*, No. 04-CV-0155, 2004 WL 1854082, at *5 (S.D.N.Y. Aug. 19, 2004) (internal quotation marks omitted).

Third, Plaintiff contends that he may circumvent judicial immunity by seeking injunctive relief and attacking the constitutionality of N.Y. Dom. Rel. Law pursuant to *Ex Parte Young*, 209 U.S. 123 (1908). *See Francis v. Pellegrino*, No. 04-4856-pr, 2007 WL 1475628, at *1 (2d Cir. May 21, 2007) ("We conclude that judicial immunity is not a bar to prospective injunctive relief against a judicial officer acting in her judicial capacity."). Nevertheless, as stated above, Plaintiff's requests for injunctive relief were dismissed from this action based on the *Younger* abstention doctrine. Even if they were not dismissed, under amendments to 42 U.S.C. § 1983, "in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable." 42 U.S.C. § 1983, *as amended by* Federal Courts Improvement Act of 1996, § 309(c), Pub. L. No. 104-317, 110 Stat. 3847, 3853 (1996); *see also Huminski v. Corsones*, 396 F.3d 53, 74 (2d Cir. 2005). Plaintiff has not alleged that a declaratory decree was violated or that declaratory relief was unavailable, and thus the 1996 amendments to § 1983 bar Plaintiff's claims for injunctive relief against Judge Hepner.

As Judge Hepner is immune from this suit in her official and individual capacities based on sovereign and judicial immunity, she is dismissed as a party to this case. Furthermore, for the

22

same reasons, absolute judicial immunity applies to "John Doe" as "Court Deputy or Court Crier" and "John Doe" is dismissed from this case.

### c. Clerk of the Court's Judicial Immunity

The Court extends absolute judicial immunity to the defendant Robert Ratanski, the Clerk of the Court for the Family Court. Judicial immunity may extend to persons other than a judge "who perform functions closely associated with the judicial process." *Clevenger v. Saxner,* 474 U.S. 193, 200 (1985). Thus, absolute judicial immunity covers only certain functions performed by court clerks. On one hand, where a court clerk performs "ministerial, non-judicial duties," or "purely administrative tasks," only qualified, good faith immunity attaches. *Isasi v. Heinemann,* No. 08-CV-5284, 2009 WL 159601, at *2 (E.D.N.Y. Jan. 22, 2009); *see also Woodard v. Mennella,* 861 F. Supp. 192, 197 (E.D.N.Y. 1994); *Kane v. Han,* 550 F.Supp. 120, 122-23 (E.D.N.Y. 1982); *Gutierrez v. Vergari,* 499 F.Supp. 1040, 1047 n.5 (S.D.N.Y. 1980); *Le Grand v. Evan,* 702 F.3d 415, 418 (2d Cir. 1983) ("Although we have not passed on the issue, many courts have accorded clerks only a qualified 'good faith' immunity from liability arising from ministerial acts.").

On the other hand, even for administrative functions, absolute judicial immunity protects court clerks in the performance of tasks "which are judicial in nature and an integral part of the judicial process." *Rodriguez v. Weprin,* 116 F.3d 62, 66 (2d Cir. 1997) (holding that a clerk's scheduling duties, as part of "[a] court's inherent power to control its docket" is subject to absolute immunity). Thus, a clerk's acts that implement judicial decisions or that are performed at the direction or under the supervision of a judicial officer come under the ambit of judicial immunity. *Bliven,* 418 F. Supp. 2d at 138; *see also Isasi,* 2009 WL 159601, at *2 (absolute immunity granted where "the judge was the ultimate decision maker and the clerk was just

carrying out the orders of the judge"). The same protection extends to court clerk functions performed pursuant to the established practice of the court. *Humphrey v. Court Clerk for the Second Circuit*, No. 5:08-CV-0363, 2008 WL 1945308, at *2 (N.D.N.Y. May 1, 2008) (citing *Rodriguez*, 116 F.3d at 67).

In this case, Plaintiff contends that the Clerk of the Court failed to "process" three of his motions which resulted in the loss of parental, constitutional, civil and other rights. Am. Compl. ¶¶ 56-58, 72-74, 292-93. Specifically, Plaintiff alleges that after he mailed a motion on November 7, 2007 to defendant Ratanski, Ratanski and others never processed the motion and the Family Court never granted him a hearing on the motion. *Id.* ¶ 57. He also alleges that on January 9, 2008, he mailed another motion addressed to Ratanski, which Plaintiff contends requires the clerk to issue an order directing the respondent in the case to appear within three days. *Id.* ¶¶ 72-73. He claims that Ratanski and others never processed the motion and never issued an order directing defendant Middleton to appear in court. *Id.* ¶ 74. Lastly, Plaintiff avers that he personally hand-delivered a motion on July 3, 2008 and Ratanski and others "refused to process" the filing. *Id.* ¶¶ 292-93.

The Court is satisfied that the court clerk's acts here enjoy the protection of absolute immunity. Plaintiff seeks to sue the Family Court clerk for failing to (1) process motions, (2) grant a hearing on a motion, and (3) issue an order directing a party to appear. While Plaintiff fails to state why the clerk did not process his motions, the Family Court is entitled to establish its procedures and requirements for filing a motion and Plaintiff has failed to plead that his motion complied with those requirements. Furthermore, the act of issuing an order compelling another party to appear is at the heart of the judicial function. Thus, these acts are discretionary actions of a judicial character or are actions made pursuant to established court practices.

Indeed, the "Clerk's Office activities of filing and docketing legal documents" are an "integral part of the judicial process" and are entitled to absolute immunity. *Pikulin v. Gonzales*, No. 07-Civ.-412, 2007 WL 1063353, at *2 (E.D.N.Y. Apr. 5, 2007). In *Pikulin*, the plaintiffs alleged that the clerk's office violated their civil rights by permitting the defendant to file "illegal motions," altering docket entries, refusing to enforce an alleged default judgment against defendant, refusing to accept for filing copies of previously filed documents, removing a judge's order from the docket, and intentionally mailing documents to an incorrect address. *Id.* at *4. Thus, the facts of this case are closer to *Pikulin* than to *Humphrey*, where the court suggested that a court clerk may not be entitled to absolute immunity for "refus[ing] to accept the papers of a litigant seeking to commence an action." *Humphrey*, 2008 WL 1945308, at *2 (citing *Le Grand*, 702 F.2d at 418).

Here, the public interest in protecting "the entire judicial process from vexatious lawsuits brought by disappointed litigants" is called into question by Plaintiff's suit against Ratanski, *Antoine*, 508 U.S. at 437, and thus, defendant Ratanski and other "John Does" in the Clerk of Court staff are entitled to absolute immunity and are dismissed from this suit.

## VI. Lauro and Montrose Defendants' Quasi-Judicial Immunity

Lauro and Montrose are also immune from this suit based on the doctrine of quasi-judicial immunity. "A private actor may be afforded the absolute immunity ordinarily accorded judges acting within the scope of their jurisdictions if his role is functionally comparable to that of a judge, . . . or if the private actor's acts are integrally related to an ongoing judicial proceeding." *Mitchell v. Fishbein*, 377 F.3d 157, 172-73 (2d Cir. 2004) (internal citations and quotation marks omitted). This quasi-judicial immunity applies to federal claims in federal court. *See Gross v. Rell*, 585 F.3d 72, 81 (2d Cir. 2009). Absolute immunity has extended to

witnesses sued for civil damages based up their testimony, prosecutors whose challenged actions are intimately associated with the judicial process, social workers and child welfare workers whose challenged actions involve the initiation and prosecution of child custody or dependency proceedings, guardians ad litem in child custody proceedings, probation and parole officers whose challenged actions were taken in their adjudicatory capacities, court-appointed doctors and psychiatrists, and court-appointed evaluators in guardianship proceedings. *See Faraldo v. Kessler*, No. 08-CV-261, 2008 U.S. Dist. LEXIS 5367, at \*12 (E.D.N.Y. Jan. 23, 2008) (collecting cases).

In the category of private actor's acts integrally related to ongoing judicial proceedings, absolute immunity may attach to non-judicial officers and employees where the individual serves as an "arm of the court," *Scotto v. Almenas*, 143 F.3d 105, 111 (2d Cir. 1998) (quoting *Dorman v. Higgins*, 821 F.2d 133, 137 (2d Cir. 1987)), or where the individual conducts "activities that are inexorably connected with the execution of [court] procedures and are analogous to judicial action," *id.* (quoting *Wilson v. Kelkhoff*, 86 F.3d 1438, 1444 (7th Cir. 1996)). Nevertheless, "[t]he more distant a function is from the judicial process, the less likely absolute immunity will attach." *Id.* (quoting *Snell v. Tunnell*, 920 F.2d 673, 687 (10th Cir. 1990)). Thus, immunity will not attach where an individual acted under her own initiative rather than "at the initiative of the court." *Id.*; *see also Snell*, 920 F.2d at 692 n.18 (only qualified immunity will apply when actions are "further removed from the judicial process and are not initiated by courts").

Here, Montrose is a licensed clinical social worker appointed by the Family Court to conduct therapeutic supervised visitations in Plaintiff's child custody dispute. Am. Compl. ¶ 20. Montrose attempted to arrange visits with the parties, including contacting Plaintiff and Elena, before meeting resistance from Plaintiff and terminating the court-ordered visitations. *See id.* ¶¶

105, 112-14. Lauro, Ph.D, is a licensed psychotherapist appointed by the Family Court to evaluate the parties in the child custody dispute. *Id.* ¶ 21. Plaintiff asserts that Montrose and Lauro violated his constitutional rights based on their court-appointed roles. Under these pleaded facts, Lauro and Montrose's acts are "integrally related to the judicial process," *Mitchell*, 377 F.3d at 172-73, and are thus subject to absolute immunity.

As court-appointed forensic evaluators and social workers, Lauro and Montrose acted as "arms of the court" at the court's initiative. In *Hughes v. Long*, the Third Circuit held that court-appointed evaluators in a child custody proceeding enjoyed judicial immunity from federal civil rights liability as "a non judicial person who fulfills a quasi-judicial role at the court's request." 242 F.3d 121, 126 (3d Cir. 2001). The Third Circuit explained that the court-appointed evaluators in that case had interviewed all relevant parties, administered tests and sent the parties for psychological testing, and made a recommendation regarding a custody arrangement to the court. *Id.* In essence, the evaluator's function was to engage in neutral fact-finding and advise the court. *Id.* at 127. The Third Circuit found these functions "intimately related and essential to the judicial process because they aid and inform the court in its discretionary duties." *Id.*

Lauro performed similar functions, including, *inter alia*, interviewing and consulting with Dawn Middleton, Elena and others, and making reports and recommendations to the Family Court. Montrose had more limited contact with the Family Court proceedings since Plaintiff refused to engage in the therapeutic supervised visits, but her role was also to interview and consult with the parties and others, conduct supervised interactions between the parties, and provide a written report to the Family Court. *See* Rubin Aff., Ex. A, Order For Supervised Therapeutic Visits (Feb. 14, 2008). Moreover, like the custody evaluators in *Hughes*, Montrose and Lauro did not initiate the child custody proceedings but were drawn in the dispute by the

appointment of the Family Court. *Hughes,* 242 F.3d at 126. Thus, they functioned "more like witnesses or assistants to the court than advocates." *Id.*

The concerns animating the doctrine of quasi-judicial immunity are no more apparent than in this case. On February 18, 2009, Lauro filed a motion in the Family Court seeking to be relieved of his assignment as the independent, neutral forensic evaluator based upon his discomfort at having been named a defendant in this case. *See In the Matter of Lauro,* 879 N.Y.S.2d 293 (N.Y. Fam. Ct. Apr. 17, 2009).[4] Without the protections of absolute immunity in these circumstances, disgruntled litigants in family courts can immobilize judicial proceedings by vexatiously haling family court evaluators or social workers into federal court. As the Third Circuit recognized, "[i]n the absence of the extensive fact-finding and recommendations of child-custody evaluators, courts would be required to make custody recommendations with little, if any, unbiased information about the family." *Id.* at 127. Given this integral relationship to the court, the court-appointed evaluators and social workers should be entitled to judicial immunity and Lauro and Montrose are hereby dismissed from this action. Plaintiff's twenty-ninth cause of action against Montrose and forty-eighth cause of action against Lauro are also dismissed.[5]

## VII. CLC Defendants' Absolute Immunity

Quasi-judicial immunity also protects the CLC Defendants from suit. Carol Sherman and Martha Schneiderman served as Elena's "court-appointed family court counsel," Am. Compl. ¶¶

---

[4] Although not contained in the Complaint, the Court takes judicial notice of this fact. *See Piccolo v. N.Y. City Campaign Fin. Bd.,* No. 05-CV-7040, 2007 WL 2844939, at *2 (S.D.N.Y. Sept. 28, 2007) (courts may consider matters of which judicial notice may be taken in a Rule 12(b)(6) motion). *See also Oliver v. Tepperman,* No. 08-CV-3685, 2010 WL 889276, at 1 (E.D.N.Y. Mar. 10, 2010) (taking judicial notice of a state court decision).

[5] Plaintiff argues that Title VI of the Civil Rights Act of 1964 may deprive Lauro, Montrose and other defendants of their quasi-judicial or judicial immunity. Such an argument is meritless. Title VI may abrogate *sovereign* immunity for certain state actors that receive certain federal funding. "Nevertheless, not all immunities are created equally." *United States v. Bond,* No. 09-CV-1824, 2009 WL 3254472, at *10 (E.D.N.Y. Oct. 9, 2009). Title VI abrogation has no bearing on quasi-judicial or judicial immunity.

17-18, or law guardians, *see* N.Y. Fam. Ct. Act §§ 241, 249. CLC employs both attorneys and "oversaw and approved of all the . . . acts of Sherman and Schneiderman." Am. Compl. ¶ 19. Plaintiff complains that CLC Defendants have represented, and continue to represent his daughter in the Family Court over his objection. In the course of CLC Defendants' representation of Elena, they have interviewed the parties, including Plaintiff, Dawn Middleton and Elena, reviewed motions and exhibits, filed motions on behalf of the child, and provided recommendations and findings to the Family Court. *See, e.g.*, CLC Defs. Ex. E.

The Second Circuit recently applied the common law quasi-judicial immunity to preclude § 1983 liability of a law guardian and her director in a litigant's action arising out of family court proceedings. *Yapi v. Kondratyeva* No. 07-4800-cv, 2009 WL 2030359, at *1 (2d Cir. July 10, 2009) (citing *Bluntt v. O'Connor*, 737 N.Y.S.2d 471 (N.Y. App. Div. 2002); *Bradt v. White*, 740 N.Y.S.2d 777 (N.Y. Sup. Ct. Greene Cty. 2002)). *See also Gardner by Gardner v. Parson*, 874 F.2d 131, 146 (3d Cir. 1989) (guardian ad litem received absolute immunity in acting as an "actual functionary or arm of the court"); *Cok v. Cosentino*, 876 F.2d 1, 3 (1st Cir. 1989) (guardian ad litem and conservator appointed by family court judge "were involved in the adjudicative process and shared in the family court judge's absolute immunity"); *Kurzawa v. Mueller*, 732 F.2d 1456, 1458 (6th Cir. 1984) (guardian ad litem was absolutely immune from suit since the guardian "must act in the best interests of the child he represents. This position clearly places him squarely within the judicial process to accomplish that goal."); *Lewittes v. Lobis*, No. 04 Civ. 0155, 2004 WL 1854082, at *12 (S.D.N.Y. Aug. 19, 2004) (applying New York's quasi-judicial immunity to law guardians in a § 1983 action).

Here, in advocating on behalf of the best interests of Plaintiff's young child, including investigating and interviewing the parties and making recommendations to the court, CLC

Defendants provided a crucial service to the Family Court. They gave the Family Court a neutral, unbiased and independent voice for Elena, who is too young to speak for herself. Thus, CLC Defendants are entitled to absolute quasi-judicial immunity and they are hereby dismissed from this case. Plaintiff's sixty-sixth cause of action against CLC Defendants is also dismissed.

## VIII.  Mayerson Defendants

The Court next evaluates Plaintiff's federal claims against the remaining Defendants. Plaintiff generally asserts that defendants Harold Mayerson, Sophie Jacobi, and Mayerson, Stutman, Abramowitz, Royer L.L.P., have conspired with co-defendant Dawn Middleton to deprive Plaintiff of his rights to custody, visitation and communication with his child. The Mayerson Defendants served as counsel to Dawn Middleton in the Family Court proceedings. Am. Compl. ¶¶ 14-16, 51. Plaintiff's first through nineteenth causes of action, as well as his forty-seventh and sixty-first are brought pursuant to 42 U.S.C. §§ 1981, 1982, 1983, 1985(3), 1986, and 1988, alleging violations of the First, Fourth, Fifth, Eighth, Ninth, Thirteenth and Fourteenth Amendments. The Court liberally construes Plaintiff's Complaint in reviewing these claims.

### a.  42 U.S.C. §§ 1981 & 1982

Section 1981 prohibits race-based discrimination in the creation and enforcement of contracts. *DeLong v. Soufiane*, No. 05-CV-5529, 2010 WL 234781, at *6 (E.D.N.Y. Jan. 14, 2010) (citing *Gibbs-Alfano v. Burton*, 281 F.3d 12, 16 (2d Cir. 2002)). Section 1982 provides that "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982. To state a claim under either § 1981 or § 1982, Plaintiff must allege facts that support the following three elements: (1) he is a member of a racial

minority; (2) an intent to discriminate on the basis of his race by defendant; and (3) the

discrimination concerned one or more activities enumerated in the Section 1981 or 1982, *e.g.*,

making contracts or the purchase of personal property. *Jones v. Nat'l Commc'n & Surveillance

Networks*, 409 F. Supp. 2d 456, 470 (S.D.N.Y. 2006); *see also Mian v. Donaldson, Lufkin &

Jenrette Sec. Corp.*, 7 F.3d 1085, 1088 (2d Cir. 1993). In order to satisfy the second element of a

§ 1981 claim, plaintiff must further allege that defendants' actions were purposefully

discriminatory and racially motivated. *Amadasu v. Ngati*, No. 05-CV-2585, 2006 WL 842456, at

*6 (E.D.N.Y. Mar. 27, 2006) (citing *Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S.

375, 391 (1982) (Section 1981 can be violated only by intentional discrimination)).

The events of intentional and purposeful discrimination, as well as the racial animus

constituting the motivating factor for defendants' actions, must be specifically pleaded in the

complaint. *Id.*; *see also Sanders v. Grenadier Realty, Inc.*, No. 08 Civ. 3920, 2009 WL 1270226,

at *2 (S.D.N.Y. May 6, 2009). "A complaint consisting of nothing more than naked assertions

and setting forth no facts upon which a court could find a violation . . . fails to state a claim under

Rule 12(b)(6)." *Evans-Gadsden v. Bernstein Litowitz Berger & Grossman, LLP*, 332 F. Supp. 2d

592, 596 (S.D.N.Y. 2004).

Plaintiff's complaint is devoid of sufficient factual allegations to support plausible claims

under §§ 1981 and 1982. Plaintiff has failed to plead any non-speculative facts supporting an

inference of racial animus, let alone intentional discrimination, on the part of the Mayerson

Defendants. A representative illustration of Plaintiff's wholly conclusory allegations against

Mayerson Defendants includes that "Defendants, Middleton, Mayerson, Jacobi, Mayerson, *et al.*,

Sherman, Children's' [sic] Law Center, *et al.* have, maliciously and indifferently to the truth, in

the furtherance of their racist and defamatory conspiracy, repeatedly parroted Montrose's racist

31

and defaming lies in order to unlawfully acquire and have unlawfully acquired relief from the Brooklyn family Court . . . ." Am. Compl ¶ 116. Although replete with formulaic recitations of legal elements, it is bereft of any specific acts of discrimination undertaken by any of the Mayerson Defendants.

Moreover, the Complaint does not show how the Mayerson Defendants infringed his contractual or other rights protected by the two statutes. From the face of the Complaint, the Mayerson Defendants did nothing more than represent Dawn Middleton in the Family Court proceedings. While the statutes protect access to courts to adjudicate *contractual rights*, *see Patterson v. McLean Credit Union*, 491 U.S. 164, 177 (1989), nothing indicates they apply to a child custody dispute.

Accordingly, the Complaint has failed to allege a plausible § 1981 or § 1982 violation by the Mayerson Defendants and those claims are dismissed against them.

### b. 42 U.S.C. § 1983

Section § 1983 protects against the deprivation of constitutional rights by state actors. *Assoko v. City of New York*, 539 F. Supp. 2d 728, 734 (S.D.N.Y. 2008). To establish a constitutional violation under § 1983, a plaintiff must show that: (1) the defendant acted under color of state law; and (2) the defendant's actions resulted in a deprivation of plaintiff's constitutional rights. *Washington v. County of Rockland*, 373 F.3d 310, 315 (2d Cir. 2004). "Private parties are generally not amenable to suit under § 1983, because they are not state actors, although they may be liable where 'there is a sufficiently close nexus between the State and the challenged action of the [private party] so that the action of the latter may be fairly treated as that of the State itself,' . . . or where they are 'jointly engaged with state officials' in a conspiracy to deprive the plaintiff of his constitutional rights[.]" *Bhatia v. Yale Sch. of Med.*, No.

07-5310-cv, 2009 WL 3109884, at *1 (2d Cir. Sept. 30, 2009) (internal citations omitted). A plaintiff cannot satisfy the state action requirement solely by alleging that the defendants were private attorneys defending the interest of a party in state court proceedings. *Kashelkar v. Rubin & Rothman*, 97 F. Supp. 2d 383, 390 (S.D.N.Y. 2000). Nevertheless, where a § 1983 claim is premised on a conspiracy with a state court judge, even if the state actor is immune from suit, "[i]t does not follow, however, that the action against the private parties accused of conspiring with the judge must also be dismissed." *Lewittes,* 2004 WL 1854082, at *12 n.13 (quoting *Dennis v. Sparks*, 449 U.S. 24, 27 (1980)).

Plaintiff's § 1983 claim appears to allege that the Mayerson attorneys acted under color of state law by conspiring with the Family Court to deprive Plaintiff of his constitutional rights. Once again, Plaintiff asserts no factual basis for his conclusory conspiracy claim. Aside from bald assertions and conclusory allegations of a "conspiracy" among all the Defendants to deprive him of constitutional rights, *see, e.g.,* Pl. Opp. Br. Mayerson 7 n.17, the Court could only unearth one specific allegation supporting the purported agreement between the Mayerson Defendants and the Family Court. *See* Am. Compl. ¶ 445 ("On or about December 10, 2008, McKnight discovered that The Brooklyn Family Court had engaged in *ex parte* communications with Jacobi for the sole purpose of denying McKnight due process and equal protection."). Yet, this falls far short of pleading a "close nexus" or "joint engagement" to sustain a § 1983 claim. Indeed, Plaintiff's allegations of connection between the state court and the Mayerson Defendants is even more attenuated than in *Norley v. HSBC Bank USA,* No. 03 Civ. 2318, 2003 WL 22890402, at *5 (S.D.N.Y. Dec. 9, 2003) and *Lewittes,* 2004 WL 1854082 at *12 n.13, where the courts held that plaintiffs' allegations that the state court grants of defendant attorneys'

motions and attorneys' fees were insufficient to plead a § 1983 conspiracy. Accordingly, Plaintiff's § 1983 claims against the Mayerson Defendants are hereby dismissed.

### c. 42 U.S.C. §§ 1985(3) & 1986

Section 1985 permits the recovery of damages against persons who conspire to violate a plaintiff's civil rights. *DeLong*, 2010 WL 234781, at \*6. To state a claim under § 1985(3), a plaintiff must allege: (1) a conspiracy; (2) an intent or purpose to deprive a person of equal protection of the law; (3) an act in furtherance of the conspiracy; and (4) an injury to a person, including injury to property, person, or constitutional right. *Bhatia*, 2009 WL 3109884, at \*1 (citing *Mian*, 7 F.3d at 1087). A § 1985(3) "conspiracy must also be motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 791 (2d Cir. 2007). Section 1986 provides a cause of action against anyone "having knowledge that any of the wrongs conspired to be done and mentioned in section 1985 are about to be committed and having power to prevent or aid, neglects to do so." *Id.* (citing *Mian*, 7 F.3d at 1088). For this reason, a claim under Section 1986 must be predicated upon a valid Section 1985 claim. *DeLong*, 2010 WL 234781, at \*6.

Once again, applying the same analysis as the § 1983 claim, Plaintiff's Complaint only provides conclusory, vague, or general allegations of conspiracy between the Mayerson Defendants and the other defendants to deprive him the equal protection of the law. *See Sommer v. Dixon*, 709 F.2d 173, 175 (2d Cir. 1983). Specifically, Plaintiff fails to plead factual allegations evincing a common understanding or agreement to injure his constitutional rights by the Mayerson Defendants. Furthermore, Plaintiff fails to allege any factual support to establish that the Mayerson Defendants were motivated by "racial or . . . otherwise class-based"

discriminatory animus. For these reasons, Plaintiff's § 1985 and § 1986 claims against Mayerson Defendants are hereby dismissed.

### d. Other Federal Laws

To the extent Plaintiff asserts claims against the Mayerson Defendants under other federal law, these claims must fail. Should Plaintiff seek to bring a cause of action under the Parental Kidnaping Prevention Act ("PKPA") against Mayerson or other Defendants, *see* Am. Compl. ¶ 470, no private right of action exists under this statute. *Fischer v. Clark*, No. 08-CV-3807, 2009 WL 3063313, at *2 (E.D.N.Y. Sept. 24, 2009). Plaintiff's Complaint also invokes the Health Insurance Portability and Accountability Act ("HIPAA"), *see* Am. Compl. ¶ 256; nevertheless, the HIPAA provides no private right of action. *Warren Pearl Const. Corp. v. Guardian Life Ins. Co. of Am.*, 639 F. Supp. 2d 371, 377 (S.D.N.Y. 2009). Finally, if Plaintiff intends to maintain claims under the ADA against Mayerson Defendants, they are dismissed. The ADA prohibits discrimination on the basis of disability by employers (Title I), public entities (Title II), and public accommodations (Title III). *See McInerney v. Rensselaer Polytechnic Inst.*, 505 F.3d 135, 138 (2d Cir. 2007); *Green v. City of New York*, 465 F.3d 65, 74 (2d Cir. 2006). The Mayerson Defendants are none of these entities in this case. Accordingly, all federal claims against the Mayerson Defendants are hereby dismissed.

## IX. Dawn Middleton

The Court now turns to Dawn Middleton's motion to dismiss. Proceeding *pro se*, Middleton requested permission from this Court to join in the motions made by the other represented Defendants and to raise several additional issues. The Court granted Dawn Middleton's application and considers Plaintiff's claims in light of Middleton's submissions and the submissions of other Defendants. In essence, Plaintiff asserts that Middleton conspired with

the other Defendants to deprive him of his constitutional rights in connection with the custody of their child, Elena. Similar to Mayerson Defendants, Plaintiff's first through nineteenth causes of action, as well as his forty-seventh and sixty-first, against Middleton are brought pursuant to 42 U.S.C. §§ 1981, 1982, 1983, 1985(3), 1986, and 1988, alleging violations of the First, Fourth, Fifth, Eighth, Ninth, Thirteenth and Fourteenth Amendments.

In this case, Plaintiff's Complaint fails to sufficiently plead factual allegations supporting that Middleton was motivated by racial animus or interfered with his contractual or other rights necessary sustain § 1981 and § 1982 claims. While Plaintiff repeatedly labels Middleton "racist," name-calling alone is not enough to make a plausible civil rights claim. Nothing in the Complaint indicates that Middleton was motivated by anything other than the desire to reach finality in her custody dispute with Plaintiff.

Next, Plaintiff has not alleged that Middleton has a "close nexus" or "joint engagement" with a state actor to maintain a § 1983 action. *See Bhatia*, 2009 WL 3109884, at *1. At most, Middleton was a mere litigant before the Family Court. Nothing indicates an unlawful agreement or understanding between Middleton and Judge Hepner or the Family Court officers. Judge Hepner may have ruled in Middleton's favor on several occasions, but this does not make them co-conspirators. To hold otherwise would subject every state-court litigant to § 1983 liability.

Once again, Plaintiff's Complaint only provides conclusory, vague, or general allegations of conspiracy between Middleton and the other defendants to deprive him the equal protection of the law and it does not plausibly suggest that Middleton was motivated by racial or class-based animus. This is not enough to sustain § 1985 or § 1986 claims. For the same reasons as the

36

Mayerson Defendants, the Court dismisses any further federal claims against Dawn Middleton. Accordingly, all federal claims against Dawn Middleton are hereby dismissed.

## X.    Middleton Relatives

The Middleton Relatives, namely Illona Middleton, Carl Middleton, and Kirsten Middleton, have not entered an appearance in this matter nor have they joined in the motions to dismiss the Amended Complaint. Nevertheless, this Court may *sua sponte* consider dismissal with respect to the Middleton Relatives if the issues are substantially the same as those concerning the other Defendants and if Plaintiff had notice and full opportunity to make his claims against the Defendants. *See Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.,* 85 F. Supp. 2d 282, 288 n.4 (S.D.N.Y. 2000) (citing *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 26 n.6 (2d Cir. 1990)). This Court may also a *sua sponte* dismiss a frivolous complaint against non-moving defendants even if the plaintiff paid the filing fee. *See Esseily v. Giuliani*, No. 00-CIV-527, 2000 WL 1154313, at *2 (S.D.N.Y. Aug. 14, 2000); *Pourzandvakil v. Humphry*, No. 94-CV-1594, 1995 WL 316935 (N.D.N.Y. May 23, 1995) ("[t]he law in this circuit is that a district court may *sua sponte* dismiss a frivolous complaint even if the plaintiff paid the filing fee") (granting *sua sponte* dismissal to non-moving defendants). *See generally Pillay v. INS*, 45 F.3d 14, 17 (2d Cir. 1995) (*sua sponte* dismissal of fee paid case possible)

In this case, Illona, Carl and Kirsten are relatives of Dawn Middleton. Plaintiff mainly asserts state law claims against the Middleton relatives. Yet, Plaintiff's Complaint fails to state federal claims upon which relief may be granted against the Middleton Relatives for the same reasons that federal claims against Dawn Middleton are dismissed. The Middleton Relatives' involvement in the child custody dispute is even more tangential than Dawn Middleton's and Plaintiff's Complaint fails to allege any racial animus, conspiracy, or close nexus or joint

engagement with a state actor on the part of the Middleton Relatives. Since federal claims against Middleton Relatives are identical to the claims against Dawn Middleton, Plaintiff had an adequate opportunity to make his case against them.

Although *pro se* plaintiffs are generally allowed to re-plead, *sua sponte* dismissal is appropriate and necessary here because (1) Plaintiff's claims lack an arguable basis in law and fact; (2) Plaintiff was unable to articulate actionable conduct in his amended complaint after receiving the defendant's initial motions pursuant to Rule 12(b)(6); (3) Plaintiff's claims against the Middleton Relatives, at best, are similar to claims against Dawn Middleton, which the Court has ruled as implausible; and (4) the issues of frivolity and implausibility have been presented by some of the other moving Defendants. Accordingly, the Court dismisses all federal claims against the Middleton relatives with prejudice.[6]

## XI. Plaintiff's State Law Claims

Plaintiff's remaining causes of action are pendent state law claims. Under 28 U.S.C. § 1367(c)(3) a district court, in its discretion, may "decline to exercise supplemental jurisdiction over state law claims if it has dismissed all federal claims." *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 103 (2d Cir. 1998). In exercising its discretion, "a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity . . . ." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). "When the balance of these factors indicates that a case properly belongs in state court, as when the federal-law claims have dropped out of the lawsuit in its early stages and

---

[6] Plaintiff failed to provide "proof of service" to the Middleton Relatives to the Court as required by Federal Rules of Civil Procedure Rule 4(l). Thus, the Court cannot verify that the Middleton Relatives have been properly served. Plaintiffs, in general, are given wide leeway to amend proof of service. *Nolan v. City of Yonkers*, 168 F.R.D. 140, 143 (S.D.N.Y. 1996). Nevertheless, even if service was proper in the case of the Middleton Relatives, the Complaint would still be dismissed for the reasons stated in this section.

only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice." *Id.* In the instant case, all federal claims have been dismissed against all Defendants and nothing counsels this Court to retain the state law claims. Accordingly, this Court declines to exercise supplemental jurisdiction and dismisses the remaining state law claims.

## CONCLUSION

For the foregoing reasons, all federal claims against all Defendants are dismissed with prejudice. As this Court declines to exercise jurisdiction over Plaintiff's remaining state law claims, all state law claims are dismissed without prejudice. Plaintiff's complaint is hereby dismissed in its entirety and the Clerk of the Court is directed to close this case.

**SO ORDERED.**

Dated: March 24, 2010
      Brooklyn, New York

SANDRA L. TOWNES
United States District Judge